IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| JOSEPH FRANK MENDOZA, CAROL JOCKS, DAWN CAVEYE and GINA and DANA DALTON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LITHIA MOTORS, INC., LITHIA FINANCIAL CORPORATION, SALEM-V, LLC d/b/a VOLKSWAGEN OF SALEM, LITHIA KLAMATH, INC. d/b/a LITHIA KLAMATH FALLS AUTO CENTER, and LITHIA MEDFORD HON, INC.<br><br>Defendants. | Case No. 6:16-CV-01264-AA<br>**OPINION AND ORDER** |

AIKEN, District Judge:

Plaintiffs bring this putative class action suit against Lithia Motors, Inc., et al. ("Lithia"), asserting various claims including violations of Oregon's Unlawful Trade Practices Act ("UTPA"), and Oregon's financial elder abuse statute. The named plaintiffs all purchased vehicles and other goods or services from one or more of the named defendants. In the process of those

Page 1 – OPINION AND ORDER

sales, the Plaintiffs allege that Lithia did not appropriately disclose its specific fees associated with the arrangement of financing or the profit margins related to the sale of third-party products and services. Defendants now move for summary judgement (doc. 74) in their favor on plaintiffs' remaining claims. For the reasons set forth herein, defendants Motion for Summary Judgment is GRANTED.

## BACKGROUND

The factual background of this case has been thoroughly outlined in the two previous orders by this court dealing with defendants' previous motions to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6). (docs. 21 and 68) Briefly:

> [o]n or about June 6, 2016, plaintiff Joseph Frank Mendoza purchased a vehicle from Lithia at its Volkswagen of Salem dealership. The dealership arranged for vehicle financing with an interest rate of 3.94%, a higher rate than provided by the lender. In doing so, Lithia retained what plaintiffs termed a kickback in connection with the arrangement of financing. Lithia also sold Mr. Mendoza products and services obtained through third parties. Specifically, Mr. Mendoza paid Lithia $2,495.00 for a vehicle service contract and $695.00 for gap insurance; both amounts exceeded Lithia's actual purchase price. Lithia purchased the service contract for $995 and the gap insurance for $278 and retained the difference as profit. Lithia did not disclose its specific fees associated with the arrangement of financing or the profit margins related to the sale of third-party products and services.
>
> In February 2013, plaintiffs Carol and Martin Jocks purchased a vehicle from a Lithia dealership in Klamath Falls, Oregon. Then, in August 2013, the Jocks purchased another vehicle from the same dealership. Carol Jocks was over the age of sixty-five at the time of the purchases. Because the facts surrounding both transactions are identical or substantially similar, I will limit discussion to the latter of the two. In August 2013, Lithia arranged for vehicle financing at an interest rate of 3.99%, a higher rate than provided by the lender. In doing so, Lithia retained a fee in connection with the arrangement of financing. Lithia also sold the Jocks products and services obtained through third parties. For example, the Jocks purchased a lifetime oil service for $899, credit life insurance for $2.644.05, and gap insurance for $435; each charge exceeds Lithia' s actual purchase price. Lithia purchased the lifetime oil service for $449.50, credit life insurance for $1,718.63, and gap insurance for $285; Lithia then sold these products to the Jocks and retained the difference as profit. Lithia did not disclose its specific fees associated with the arrangement of financing or the profit margins related to the sale of third-party products and services.
>
> Plaintiffs Caveye and Dalton also purchased vehicles from Lithia, in November 2014 and May 2016 respectively. The circumstances surrounding these purchases are largely similar

to those mentioned above. In both instances, Lithia arranged for financing and sold third-party products/services to plaintiffs. In both instances, Lithia retained and did not disclose fees associated with the arrangement of financing or profits related to the sale of third-party products and services.

*Mendoza v. Lithia Motors, Inc.*, 2018 WL 1513650, at *1-2 (D. Or. Mar. 27, 2018)

Procedurally, on June 24, 2016, plaintiffs filed this class action suit, subsequently filed an amended complaint on September 1, 2016. On January 11, 2017, the Court granted in part defendants' first Motion to Dismiss (doc. 15) certain claims pursuant to Fed. R. Civ. Proc. 12(b)(6). (doc. 21) Plaintiffs were granted leave to amend on the remaining claims. Plaintiffs filed a second Amended Complaint on February 10, 2017, and the Court then granted plaintiffs leave to file a Third Amended Complaint, which was entered on the docket on June 23, 2017. (doc. 41) On March 27, 2018, the Court granted in part and denied in part defendants' second Motion to Dismiss (doc. 48), dismissing plaintiff's claims relating to federal Truth in Lending Act and certain claims brought under Oregon's UPTA. Defendants subsequently filed the present Motion for Summary Judgment (doc. 74) on plaintiffs' three remaining claims.

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine issue of material fact. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. Partnership*, 521 F.3d 1201, 1207 (9th Cir. 2008).

Page 3 – OPINION AND ORDER

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T. W. Elec.,* 809 F.2d at 630. "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving patty, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship,* 521F.3d1201, 1207 (9th Cir. 2008).

## DISCUSSION

Plaintiffs remaining claims involve allegations that defendants violated the UPTA and Oregon's Financial elder abuse statute. Specifically, plaintiffs allege that defendants failed to comply with the disclosure requirements of the UPTA, and that in failing to make those disclosures, defendants wrongfully appropriated money from elderly persons. I address each claim in turn.

I. *Oregon UPTA Claims*

    A. *Claim Under OAR 137-020-0020(3)(k)*

First, plaintiffs have alleged that defendants violated Or. Rev. Stat. § 646.608(l)(u) which makes it a violation of the UPTA to engage in "any other unfair or deceptive conduct in trade or commerce" as established via rule by the Oregon Attorney General. Or. Rev. Stat. § 646.608(1)(u). Plaintiffs rely on OAR 137-020-0020(3)(k) titled "Undisclosed Fee Payments," which provides that:

> [a] dealer who sells or leases a motor vehicle to a consumer and makes any payment to any non-employee third-party in conjunction with the sale or lease, other than a referral fee of $100 or less (also known as a "bird-dog" payment), must specifically itemize such payment on the consumer's purchase order, lease agreement and retail installment contract.

The parties do not dispute that defendants did not disclose the fees earned for the sale of the third-party products at issue in this case. Instead the dispute between the parties is ultimately whether OAR 137-020-0020(3)(k) controls only referral payments, or if the rule touches every third-party non-employee payment.

Plaintiffs contend that the scope of Rule OAR 137-020-0020(3)(k) encompasses any and all payments made to a non-employee third-party, referral and otherwise, if they exceed $100 in amount. Conversely, defendants assert that profits on third party products such as service contracts, gap insurance, and credit life insurance, which are at issues in this case, are not the focus of this rule. They argue, the rule applies only to referral fees, otherwise known as bird-dog payments. These are payments of any amount "paid by a dealership to a third party who referred a customer to the dealership" but are distinct from fees earned for the sale of third-party products. Defs.' Mot. Summ. J. at 9; 2nd Nichols Decl at ¶ 4. These bird-dog fees are typically paid to third-party brokers and lead generators as an inducement and reward for referring customers to dealerships. 2nd Nichols Decl at ¶ 5.

At the summary judgment stage, the Court is persuaded by defendants' argument in interpreting this rule as applying to referral fees alone. First, the section is titled "Undisclosed Fee Payments," and the text of the of the rule itself directly references referral fees, otherwise known as bird-dog payments. Defendants also offer declarations from Craig Nichols, who served as a member of the advisory committee that originally drafted and later revised the rule.[1] Mr. Nichols

---

[1] Plaintiffs also submit declarations of attorneys who were involved in the revision of this rule. *See* Gear Decl., Roberts Decl. and Walgenkim Decl. Defendants dispute whether the Court can or should wholly examine these declarations for various reasons. In sum, however, plaintiffs argue that at the time revisions were made to the rule, there was no intent make the rule more limiting. However, the Court is persuaded that the rule as originally drafted was meant to apply to referral fees only, and therefore it was not limited during the 2015 revisions. Rather, it was merely clarified by the Official Commentary which is discussed further in this opinion.

Page 5 – OPINION AND ORDER

notes that at the time the rule was originally drafted and adopted it was intended to "regulate only the disclosure of bird-dog fees, not any other payments by a dealership to a third party." 2nd Nichols Decl. at ¶ 5. Indeed, Mr. Nichols further points out that O.A.R. 137-020-0020(3)(k) was adopted specifically out of concern about referral fees, which were common at the time and could cost consumers as much $500. 1st Nichols Decl. at ¶ 6. He goes on that the rule was meant to ensure the payments were itemized on customer facing paperwork. *Id.*

The interpretation that the rule applies only to referral fees is buttressed by the official commentary, added in 2015, to the OAR, which states:

> OFFICIAL COMMENTARY: This rule is intended to apply to a payment of more than $100 made to a single individual or business entity. For example, if two unrelated individuals refer a purchaser to a specific dealership, each individual may receive a payment of $75 and the dealer does not need to specifically itemize the payments. However, the dealer may not make a payment of $75 to a dealership and $75 to the owner of the dealership and fail to itemize the $150 payment on the purchase order, lease agreement and retail installment contract.

O.A.R. 137-020-0020(3)(k), Official Commentary.

While plaintiffs suggest that the Official Commentary indicates that the rule is intended to apply to any payment, rather than a referral payment, the Court finds that the Official Commentary is no more than an articulation that the $100 limit on fees for *"refer[ing] a purchaser to specific dealership"* applies to multiple individuals within one business entity. *Id.* (emphasis added) The commentary utilizes an explanatory third-party payment hypothetical in which the payment, tellingly, is a referral. The Official Commentary of the rule does not apply it to any payment of more than $100 made to an individual or business entity, but rather it gives a specific example outlining the requirement as applied to a $75 payment to a dealership and $75 payment to the owner of the dealership that needs to be itemized as $150 referral payment. The Commentary is clarifying the personal as opposed to the business aspect of the referral payment, not applying the

itemization requirement to all third-party payments as is suggested by plaintiffs. The Official Commentary is no more than an elaboration of the contours of the $100 payment limit and more appropriately comports with an understanding that OAR 137-020-0020(3)(k) governs only referral payments.

Further, plaintiffs' interpretation of the rule would impose an expansive itemization requirement upon dealers. If OAR 137-020-0020(3)(k) required itemization of all fees and payments to the third-parties (other than "bird-dog" payments), Oregon car dealers would be required to itemize a litany of payments on the customer's documents, thus volunteering the profits made on any third-party product associated with the sale. The dealer's personal cost of the very vehicle itself, being a third-party payment, would presumably fall under this expansive disclosure requirement.

For all these reasons, the Court holds that OAR 137-020-0020(3)(k) only requires disclosure of referral fees paid to a non-employee third-party in the amount of $100 dollars or more. Thus, the Court grants Summary Judgment in defendants favor on this claim.

  *B. Claim Arising Under OAR 137-020-0020(3)(u)*

Plaintiffs have also asserted a claim arising under § 646.608(1)(u) pursuant to OAR 137-020 0020(3)(u), titled "Yield Spread Premium Disclosure," which provides that an auto dealer "shall clearly and conspicuously disclose in writing . . . that the dealer or broker may receive additional compensation from the consumer for arranging the sale of the retail installment contract which may be in the form of a fee or additional loan points." OAR 137-020-0020(3)(u)(A)(l). A "yield spread premium" relates to transactions involving some "difference between a higher interest rate quoted to a consumer by a dealer or broker and the buy rate offered to the dealer or broker by a financial organization." OAR 137-020-0020(2)(ii) The term "clearly and

conspicuously" is defined by rule in relevant part:

> (j) "Clear and conspicuous," including the terms "clearly" and "conspicuously," means that a message, statement, information, representation or term is conveyed in a manner that is readily noticeable, will be easily understood by the average person, and is in a meaningful sequence. In order for a message to be considered "clearly and conspicuous," it shall, at a minimum:
> (A) Not contradict or substantially alter any terms it purports to clarify, to explain or which it otherwise relates; [and]
> (B) Be in direct proximity to the message, statement, information, representation or term it clarifies, modifies or explains, or to which it otherwise relates...

OAR 137-020-0020(2)(j)

The only vehicle purchase involving a yield spread premium was the Daltons', and thus this claim is confined to those plaintiffs alone. Plaintiffs have alleged that defendants failed to clearly and conspicuously disclose to the Daltons that defendants did receive additional compensation for arranging the financing which was in the form of a fee or additional loan points.

As discussed in previous orders, the language defendants used in the retail installment contract is not disputed: "[t]he Annual Percentage Rate may be negotiable with the [dealership]," and the dealership "may assign this contract and retain [its] right to receive part of the finance charge." Sacks Decl. Ex. 6. At this stage of the proceedings the Court goes beyond the pleadings and examines other evidence submitted by the parties. Namely, defendants proffer multiple documents which they argue also contains language that satisfies the disclosure requirements. In addition to the language quoted from the retail installment contract, defendants also point to the disclosure made in the in the "Credit and Financing" Section of the two-page delivery agreement signed by the Daltons. It states:

> Customer understands the annual percentage rate or lease money factor (APR LMF), as applicable, may be negotiated with [the dealership]. Customer further understands that [the dealership] may retain a portion of the finance charge or receive other compensation for arranging Customer's financing.

Page 8 – OPINION AND ORDER

Sacks Decl., Ex. 30. This language is mirrored in pencil sheet and vehicle closing statement which were also provided for the Daltons review:

> I understand that I may obtain my own financing. I also understand that the annual percentage rate may be negotiated with the seller and that the seller may retain a portion of the finance charge or receive other compensation for arranging my financing

Sacks Decl. Exs. 18 and 24.

Plaintiffs argue that this language is deficient insofar as it 1) was not clearly and conspicuously communicated and 2) does not conform to the specific language prescribed in the OAR.

Regarding plaintiffs' complaint that these disclosures do not mirror the statute closely enough, specifically that it is not disclosed that additional compensation would be from the customer or in the form of a fee or additional loan points, the Court notes that strict recitation of the statute is not required to meet the clear and conspicuous standard. The language here discloses to the buyer that the seller may retain a portion of the finance charge or receive other compensation for arranging the financing. This language is substantially similar to the OAR 137-020-0020(3)(u)(A)(i), which, again, provides that a dealer must disclose that it "may receive additional compensation from the consumer for arranging the sale of the retail installment contract which may be in the form of a fee or additional loan points." Indeed, the retail installment contract explicitly states that the dealership may retain the right "to receive part of the finance charge." Sacks. Decl. Ex. 6. The Court holds that this language objectively would "easily be understood the average person" and it does not contradict or substantially alter any terms it purports to clarify. OAR 137-020-0020(3)(u)(A)(i)

Indeed, Ms. Dalton admitted in deposition to only glancing at these disclosures. Sacks Decl. Ex. 31 at 5-6. Ms. Dalton agreed that the above language would mean that Volkswagon of

Page 9 – OPINION AND ORDER

Salem might retain a portion of the finance charge or receive other compensation for arranging the financing on the purchase of their vehicle and that she would have understood that had she read the disclosure at the time. *Id.* at 8-9.

The Court further holds that given the number of disclosures and their locations in various short documents, the language was clearly and conspicuously disclosed in that it was conveyed "in a manner that is readily noticeable and [. . .] in a meaningful sequence." OAR 137-020-0020(3)(u)(A)(i) Thus, the Court holds that these disclosures were "clear and conspicuous" and were readily visible, logically placed in the documents containing them, and easily understandable.

Even construing the allegations in the light most favorable to the plaintiffs, the above-mentioned facts regarding "clear and conspicuous disclosures" do not raise a genuine issue of material fact and as such are subject summary judgment as well.

II.  *Financial Abuse of Elders*

Plaintiff's final claim deals with financial elder abuse stemming from Defendant' alleged violations of OAR 137-020-0020(3)(k), in relation to the Jocks, who were senior citizens when they purchased their vehicles from Volkswagen of Salem. To establish a claim for elder financial abuse, a plaintiff must show "(1) a taking or appropriation (2) of money or property (3) that belongs to an elderly or incapacitated person, and (4) the taking must be wrongful." *Church v. Woods*, 190 Or. App. 112, 117, 77 P.3d 1150 (2003).

Plaintiff's claim for elder abuse is premised on their claim that defendants violated the requirements OAR 137-020-0020(3)(k) with respects to the Jocks' two vehicle purchases. The Court has already granted summary judgement in defendants favor regarding that claim as well the claims pursuant OAR 137-020-0020(3)(u). Therefore, there was no "wrongful taking," and plaintiffs claim for elder abuse is subject to summary dismissal as well.

## CONCLUSION

For the reasons set forth herein, Defendants' Motion for Summary Judgment (doc. 74) is GRANTED. Accordingly, this action is dismissed.

IT IS SO ORDERED.

Dated this 30th day March of 2019.

_____
Ann Aiken
United States District Judge